[Cite as *In re A.B.*, 2016-Ohio-2891.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


IN THE MATTER OF:                    :

    A.B., et al.                        :          CASE NO.   CA2015-06-104

                                        :             O P I N I O N
                                                   5/9/2016
                                        :

                                        :


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JS2010-1188 and JS2007-0595


Laura L. Hornish, 212 East Court Street, Suite 102, Sidney, Ohio 45365, for appellants G.B. and C.B.

Am. B., 1883 Harvard Street, Hamilton, Ohio 45015, appellee, pro se


**HENDRICKSON, J.**

{¶ 1} Appellants, C.B. and G.B., the maternal grandmother and maternal uncle, respectively, appeal the decisions of the Butler County Court of Common Pleas, Juvenile Division, terminating their companionship and visitation rights with two minor children. For the reasons set forth below, we affirm.

{¶ 2} In October 2012, C.B. ("Grandmother") and G.B. ("Uncle") reached an agreement with appellee, Am.B. ("Mother"), regarding companionship and visitation with

Mother's two minor children, Ar.B. and P.C.B. Pursuant to this agreement, which was adopted as a court order, appellants were permitted companionship time with the children every other weekend and overnight on alternating Thursday evenings. Appellants consistently visited with the children in accordance with the court's order until early 2013.

{¶ 3} In early 2013, Mother's relationship with appellants deteriorated, and Mother unilaterally stopped following the terms of the visitation order. On March 31, 2014, appellants filed a motion to have Mother found in contempt for failing to abide by the visitation order.[1] Mother responded by filing motions to terminate appellants' companionship rights. In her affidavit in support of terminating appellants' visitation rights, Mother averred as follows:

> 4. [There have been] numerous incidents of extreme concern and safety issues result[ing] [from] the companionship time my children had with * * * [G]randmother and [U]ncle.
>
> 5. My family has refused to return the children after their scheduled time with the children requiring me to obtain police assistance.
>
> 6. Specifically, in January 2013, [Grandmother] locked herself and the children in the bedroom and would not release them to me. There have been similar incidents where I have had to involve the police to have my children returned to me.
>
> 7. When I got my phone to call the police, [Uncle] forcibly grabbed my cell phone from me harming my hand.
>
> 8. When I attempted to leave the house to go for help, he physically shoved me down and stood in front of the door.
>
> 9. My children began to come home frightened reporting that [Grandmother] was going to kill their dad and [paternal grandmother].
>
> 10. The children reported they were so frightened that when they visited their father, they were afraid to go outside for fear that their father and [paternal grandmother] would be killed.
>
> 11. During the scheduled time for them, [Grandmother] and

---

1. The motion for contempt was only filed in P.C.B.'s case, Case No. JS2007-0595. Appellants did not file a corresponding contempt motion in Ar.B.'s case, Case No. JS2010-1188.

[Uncle] moved and did not notify me and I had no idea where to get my children and had to threaten to call the police to get the new address.

12. The children reported after another visit that [Grandmother] and [Uncle] don't like mommy's boyfriend [C.L.] and he needs to be killed because he does bad things to kids.

13. The children reported that their [Grandmother] and [Uncle] reported that [Mother] is bad and that they do not have to listen to me or do anything that I say.

14. [Grandmother] and [Uncle] admitted calling Children's [S]ervices on me with no reason, including resulting in an allegation that my daughter's great-grandmother sexually abused her that led to my child having to undergo an evaluation at Children's hospital. This was unsubstantiated.

15. [Grandmother] would come to my child's school and remove him without my permission outside of the court ordered time.

* * *

17. Finally, my children have reported that [Grandmother] told them they would never see me again because she knew people who lived far away and she would hide my children from me.

18. I am gravely concerned about my children's safety and well being [sic] if allowed to continue to have contact with [Grandmother] and [Uncle].

{¶ 4} A hearing on the motions was held before a magistrate on September 17, 2014 and November 26, 2014. At the hearing, the magistrate heard testimony from Grandmother, Uncle, the principal at P.C.B.'s former school, Mother's boyfriend, a friend of Mother's, and Mother. The children's biological father was not present and did not participate in the proceedings.

{¶ 5} Grandmother testified she has lived with Uncle since at least 2012, and they currently reside in Middletown, Ohio. Grandmother stated she has a loving relationship with Ar.B. and P.C.B. and the children are bonded to her, Uncle, and Uncle's two children. Grandmother explained that in 2012, she had regular and frequent contact with the children

as Mother and the children lived with Grandmother and Uncle for a period of time. During this time, Grandmother began to develop concerns that Mother was using drugs. Grandmother stated Mother began acting "very odd" and "had large pupils." Grandmother admitted, however, she had no prior contact with illegal drugs and she could not say specifically what type of drugs she suspected Mother of abusing.

{¶ 6} In January 2013, Mother allowed her boyfriend, C.L., to stay at Grandmother and Uncle's home. After finding some paperwork in a bag C.L. had left in the home, Grandmother and Uncle discovered C.L. had been convicted in 2007 of attempted unlawful sexual conduct with a minor and was a registered sex offender. Grandmother claims she attempted to talk to Mother about C.L.'s offender status, but Mother would not talk about it other than to say that C.L. "was a sex offender [but] [i]t's okay now." Mother became upset and decided to leave the residence with the children. Although Mother claims Grandmother locked herself in a bedroom with Ar.B. and P.C.B. in an effort to prevent Mother from leaving with the children, Grandmother denies that such events took place. Grandmother does admit, however, things got heated between the parties and she called the police. Grandmother was advised by law enforcement to permit Mother to leave with the children, and Grandmother allowed this to happen.

{¶ 7} Grandmother testified she does not have any animosity towards Mother, but admitted on cross-examination that Ar.B. and P.C.B. have been exposed to "police involvement" due to issues between her and Mother on at least three occasions. Grandmother explained she brought the police with her when she came for visitation with the children at Mother's house because C.L. was present. Grandmother also stated she called the police "at least a couple of times" to ask them to do well-being checks on the children while the children were with Mother. The well-being checks did not result in the children being removed from Mother's custody.

{¶ 8} Grandmother also admitted she had called Butler County Children Services "multiple times" since 2006, regarding Mother's care of the children. In November 2010, Grandmother made allegations of neglect and physical abuse of both Ar.B. and P.C.B. These allegations were found to be unsubstantiated by children services. In February 2013, Grandmother made allegations that Ar.B. was being sexually abused by her paternal great-grandmother. Ar.B. was evaluated at the Mayerson Clinic, and the claims were also found to be unsubstantiated.

{¶ 9} Grandmother testified about problems that have occurred in exchanging Ar.B. and P.C.B. for visitation. For a while, Grandmother and Uncle would pick the children up from school for their visitation. On one occasion, Grandmother picked the children up from school when it was not her day for visitation, which resulted in Mother contacting the police. The police were also contacted when Mother attempted to pick up the children from Grandmother's and Uncle's home on the Saturday before Easter in March 2013. Although Mother was entitled to have the children for the Easter holiday, Grandmother did not want to allow Mother to take the children because it was "really late at night." The children ultimately stayed overnight with Grandmother and Uncle.

{¶ 10} On cross-examination, Grandmother denied the allegations set forth in Mother's affidavit in support of terminating appellants' companionship and visitation rights. Grandmother stated she has never told the children that "Mother is bad" and they do not need to listen to her. She also denied telling the children she would kill their dad and paternal grandmother or that Mother's boyfriend needed to be killed because he "does bad things to kids."

{¶ 11} Uncle testified that he, Grandmother, and his two children are bonded with Ar.B. and P.C.B. He stated his children have a "typical brother-sister relationship" with Ar.B. and P.C.B., and Grandmother has a "mother-child" relationship with the children. Although

he admitted to having a troubled relationship with Mother, Uncle denied that either he or Grandmother have threatened to harm Mother or Mother's boyfriend. He also claimed Mother has never expressed any concerns over P.C.B. or Ar.B. being left in his or Grandmother's care.

{¶ 12} Uncle testified that when the October 2012 visitation order first went into effect, he and Grandmother were able to see Ar.B. and P.C.B. regularly. In fact, Mother and the children lived with Uncle from the end of October 2012 until January 2013. However, in January 2013, after Uncle found some paperwork in a bag belonging to C.L. that indicated C.L. was a convicted sex offender, Mother moved out of the home and began to limit Uncle's and Grandmother's time with the children.

{¶ 13} After Uncle found out about C.L.'s status as a sex offender, he and Mother got into an argument because Uncle refused to allow C.L. to stay in his home. Uncle explained he could not have a convicted felon staying at his home as it would interfere with his job as a paramedic with a local fire department and the Butler County Sheriff's Office. Uncle testified that during the course of this argument, Mother got angry and threw her phone at him before leaving the home with Ar.B. and P.C.B. Uncle denied forcibly taking the phone away from Mother in an effort to try to prevent her from leaving with the children or to stop her from calling the police.

{¶ 14} Following this event, appellants continued to see the children. During one of the time periods where appellants had visitation, they moved residences. Although Mother denied being told where appellants had moved, Uncle claimed Mother knew where they and the children were staying as Mother had asked if she and C.L. could stay there too. Uncle claimed he told Mother she could stay at the new residence, but C.L. was not permitted at the home.

{¶ 15} Uncle testified his and Grandmother's visitation with P.C.B. and Ar.B. was

temporarily suspended near the end of February 2013, after Mother obtained a domestic violence civil protection order based on the argument that had ensued in January 2013 over C.L.'s sex offender status. Uncle explained the protection order was later dismissed and visitations resumed for a "short period of time." However, after Mother was not allowed to pick the children up from Uncle's on the Saturday before Easter, Mother stopped allowing visitation. With respect to the Easter incident, Uncle testified that when Mother attempted to pick up the children at 6:00 p.m. the day before Easter, he and Grandmother did not allow the children to go with Mother because they believed it was still their visitation time pursuant to the court's October 2012 order. Uncle testified Mother was very upset that she was not allowed to take the children and the police were called to Uncle's home to deal with the dispute. The children ultimately ended up staying with appellants overnight.

{¶ 16} After the Easter incident, Mother stopped permitting appellants visitation. Mother would not allow Grandmother or Uncle to pick the children up from school, and Mother stopped responding to their texts and phone calls. Uncle claimed he did not know where Mother was staying so he was unable to pick the children up from Mother's residence.

{¶ 17} Although Mother ended appellants' visitations with the children after the Easter incident, Grandmother and Uncle tried to maintain contact with the children by stopping by the children's school. Grandmother and Uncle went to P.C.B.'s school on P.C.B.'s birthday and had him pulled out of class so they could visit with him and give him presents. Appellants also continued to try and pick the children up at the end of the school day. On one occasion, Uncle encountered C.L., who was also trying to pick the children up from school. Uncle did not allow the children to leave with C.L. On another occasion, Grandmother and Uncle arrived at the school and took the kids home with them even though it was not their day for visitation. After the police were contacted, the children were eventually returned to Mother later that evening.

{¶ 18} Testimony about appellants' interaction with the children was offered by Jeffrey Banks, P.C.B.'s former principal. Banks testified that P.C.B. had attended the Babeck Early Childhood Center in the Edgewood School District in 2012 and 2013 for kindergarten and first grade. Banks explained that when P.C.B. was in kindergarten, Uncle and Grandmother would pick P.C.B. up from school "regularly." However, once P.C.B. started first grade, it "got sporadic" as there were issues with appellants picking up P.C.B. from school. The school had allowed P.C.B. to be released to Grandmother on a Thursday that was not her visitation day, which upset Mother and resulted in the police being called. Mother eventually removed appellants from P.C.B.'s emergency contact forms, which meant the school could no longer release P.C.B. to Grandmother or Uncle at the end of the day. However, even though Grandmother and Uncle were no longer authorized to pick up P.C.B. from school, the principal allowed Grandmother and Uncle to come to P.C.B.'s school so that they could bring P.C.B. birthday presents. P.C.B. was pulled out of class to receive the presents from appellants. According to Banks, P.C.B. "lit up" when he saw Grandmother at the school.

{¶ 19} Following appellants' visit with P.C.B. at the school, Mother contacted Banks to express her displeasure with the school allowing Grandmother and Uncle contact with P.C.B. Thereafter, P.C.B.'s attendance records significantly declined. While in first grade, P.C.B. had 33 absences, tardies, or early releases before Mother ultimately removed him from the school district in December 2013.

{¶ 20} Mother testified at the hearing that she believed it was in the children's best interest to terminate visitation with appellants as appellants have interfered with her parenting of the children, caused stress to the children, exposed the children to arguments and police involvement on numerous occasions, and caused children services to conduct investigations for unsubstantiated claims of neglect, physical abuse, and sexual abuse. Although Mother testified it was important for her children to know their family, and she conceded it might be

appropriate for Uncle to "one day" resume visitation with the children, Mother was quite adamant that Grandmother should not have visitation with Ar.B. and P.C.B. According to Mother, the children are happier when they do not have visitation with appellants.

{¶ 21} Mother explained she has always had a strained relationship with Grandmother and, to a lesser extent, Uncle. Mother felt harassed by Grandmother's decisions to contact children services and the police department to conduct well-being checks on the children. Mother also felt harassed by Grandmother's conduct of constantly driving by Mother's work-place and calling her at work. Mother explained she has worked at a gas station convenience store for eight years, and Grandmother started calling the store so often that it became disruptive. Grandmother would call and ask for Mother's work schedule and would "cuss-out" Mother's co-workers when they would not share the information with Grandmother. Eventually, Mother's boss had to ask Grandmother to stop calling.

{¶ 22} The January 2013 incident also created a strain on Mother's relationship with Grandmother and Uncle. Mother testified appellants angrily approached her after finding documents related to C.L.'s status as a sex offender. Mother claimed neither Grandmother nor Uncle would let her explain the details of C.L.'s conviction. Rather than continue to fight with them, Mother decided to take P.C.B. and Ar.B. and leave Uncle's home. However, Grandmother and Uncle would not let the children leave with Mother as they did not want the children around C.L. When Mother threatened to contact the police, Uncle knocked her cell phone out of her hand. He also pushed Mother down and blocked her exit out of the home when she threatened to go next door to call the police from a neighbor's house. While all of this was happening, Mother reported the children got "hysterical" as they "didn't know what to do." Grandmother locked the children in a bedroom with her so that Mother could not leave with the children. Eventually, after the police were called, Mother was permitted to leave with the children. About a month after this event took place, Mother obtained domestic violence

civil protection orders against Grandmother and Uncle. The protection orders were later dismissed.

{¶ 23} Mother testified she often felt like Grandmother and Uncle interfered with her time with the children. When Mother was supposed to have the children on Easter, appellants refused to abide by the terms of the visitation agreement and would not allow the children to leave with her. As a result of appellants' actions, Mother did not get to celebrate the holiday with her children on Easter morning.

{¶ 24} Appellants also interfered with Mother's parenting by challenging Mother's decisions to allow certain family members and friends around the children. Appellants began to make inappropriate statements to the children about the individuals whom appellants did not believe should be a part of the children's lives. With respect to Mother's decision to introduce C.L. into the children's lives, Mother testified she began dating C.L. with knowledge of his conviction for attempted unlawful sexual conduct with a minor. Mother explained she knew the victim from C.L.'s conviction, and Mother was comfortable with the children being around C.L. In fact, Mother testified C.L. had a great relationship with P.C.B. and Ar.B. According to Mother, C.L. is "like a father to them." C.L. currently lives with Mother, and the two have a daughter together and another child on the way.

{¶ 25} Given Mother's close relationship with C.L., she is particularly troubled by Grandmother's and Uncle's statements to the children that C.L. needs to be killed because he "does bad things to kids" and is "going to do stuff to them." Mother is also troubled by Grandmother's statements to Ar.B. and P.C.B. that she will kill their biological father and paternal grandmother and that the children do not need to listen to Mother. Mother also expressed concerns about Grandmother's threats to take Ar.B. and P.C.B. and leave the state so that Mother cannot see them anymore.

{¶ 26} Because of Grandmother's and Uncle's statements and actions, Mother ended

their visitation with the children after Easter 2013. Mother testified she removed Grandmother and Uncle from school forms so that they could no longer pick the children up from school. When Grandmother and Uncle continued to try to have contact with the children at school, and even visited P.C.B. at school in the middle of the day, Mother began to remove the children from school early. Mother explained this resulted in P.C.B. having a number of early releases before she decided to remove P.C.B. from the school altogether. P.C.B. has been enrolled in a new school in Fairfield, and he has been doing very well. Mother introduced P.C.B.'s progress report card from his new school, which demonstrated P.C.B. was doing satisfactory work in nearly all school subjects. Mother also introduced into evidence a certificate from Ar.B.'s school which shows that she was the student of the month in September 2014.

{¶ 27} C.L. testified at the hearing about his felony convictions and his interactions with appellants. C.L. explained that in October 2007, he pled guilty to attempted unlawful sexual conduct with a minor, a fifth-degree felony. As a result of this plea, C.L. became a sexually oriented offender who was required to register his address. In January 2014, C.L. was convicted of failing to provide notice of his change of address, a fifth-degree felony, and he was placed on community control for five years. With respect to his 2007 conviction, C.L. explained that he permitted a 15 or 16-year-old girl, who claimed to be 18 years old, to stay over at his house. C.L. testified there had been "no force or un-consensual" activity between himself and the minor girl. With respect to the 2014 conviction, C.L. testified he was convicted for failing to notify the proper authorities that he was staying so frequently at Mother's home. C.L. explained Mother was pregnant with their daughter at the time and was working late hours, so he started staying at Mother's house to watch P.C.B. and Ar.B. C.L. did not realize he needed to report Mother's address to law enforcement at this time.

{¶ 28} C.L. testified he has a good relationship with P.C.B. and Ar.B. C.L. often plays

games with the children and helps them with homework. He explained he and Mother try to keep the children in a set routine and visits with appellants often upset that routine. According to C.L., P.C.B. and Ar.B. act differently when they come home from visitations with Grandmother and Uncle. The children are angry and have behavioral problems for a while until they get readjusted.

{¶ 29} C.L. testified that with respect to exchanging P.C.B. and Ar.B. for visitation with appellants, "it's [been] nothing but problems." Whenever Grandmother encountered C.L. she would make a slashing gesture across her neck. On one occasion, Grandmother attempted to yank open C.L.'s car door and forcibly remove the children from his vehicle. On another occasion, Grandmother entered C.L. and Mother's home uninvited and unannounced. C.L. found Grandmother standing in the middle of the home after he got out of the shower. C.L. stated no one had invited Grandmother to enter the home, and Grandmother's unauthorized entry into the home resulted in him calling the police. C.L. could not recall if the date of this incident aligned with one of the days Grandmother was supposed to have visitation with the children.

{¶ 30} One of Mother's friends and co-workers at the convenience store also testified at the hearing. This friend testified Mother has a "wonderful" and loving relationship with Ar.B. and P.C.B and the children are bonded with C.L. The friend has overheard Ar.B. call C.L. "dad" on occasion. The friend has been present to witness some of Mother's difficulties in interacting with appellants. The friend testified that while she and Mother were working together, Grandmother called the store "several times a day," and the calls became so harassing that Grandmother was told not to call the store anymore. The friend was also present when Mother had to leave work early to get her children from Grandmother and Uncle because they refused to drop the children off with C.L.

{¶ 31} On December 26, 2014, after taking the foregoing testimony and evidence into

consideration, the magistrate rendered opinions denying appellants' motion for contempt and granting Mother's motions to terminate appellants' companionship rights. In terminating appellants' companionship and visitation with the children, the court stated the following:

> This Court's primary consideration is the best interest of the child. When weighing all the factors, this court must also give special weight and deference to the wishes of a fit parent. There is no evidence in this Case that Mother is an unfit parent. Thus, the Court finds that Mother's desire to terminate Maternal Grandmother's and Uncle's current visitation order must be given special weight by this Court. The Grandmother and Uncle have the burden of proof that companion/visitation with them is in the children's best interest.
>
> The factor[s] weighing in favor of the Grandmother's and Uncle's include the following: the Grandmother and Uncle were previously a significant part of these children's lives and that interaction was sometimes beneficial to the children. Until early 2013, both were actively involved in the children's lives and that as a result of this interaction, they developed a close bond to these children.
>
> The remaining factors appear to weigh in Mother's favor. Most importantly among them, are Mother's wishes and concern related to the health and safety of the children. She believes strongly that the conduct of Grandmother and Uncle is harmful to the children. The court finds that Grandmother and Uncle have failed to provide sufficient evidence that Mother's concerns related to the children's physical, emotional and psychological wellbeing are not rational and reasonable. When giving Mother's wishes the appropriate elevated weight, the Court finds that those wishes and her concerns outweigh the other best interest factors which weighed in Grandmother's and Uncle's favor.
>
> When weighing all the factors as required by law, the Court finds that Grandmother and Uncle have failed to meet the burden of proof regarding the best interest of these children, and that as a result, their visits should be terminated.

{¶ 32} Appellants filed objections to the magistrate's decisions, arguing that Mother "falsified testimony against [them] and the court system." On May 4, 2015, the juvenile court overruled the objections and adopted the magistrate's decisions terminating companionship and visitation.

- 13 -

{¶ 33} Appellants timely appealed, raising two assignments of error. For ease of discussion, we will address the assignments of error together.

{¶ 34} Assignment of Error No. 1:

{¶ 35} THE TRIAL COURT FAILED TO REVIEW THE COMPELLING REASONS AND CIRCUMSTANCES THAT WOULD ALLOW THEM TO DISREGARD THE "SPECIAL WEIGHT" GIVEN TO [MOTHER'S] WISHES REGARDING COMPANIONSHIP OF THE CHILDREN WITH THE APPELLANTS.

{¶ 36} Assignment of Error No. 2:

{¶ 37} WHILE "SPECIAL WEIGHT" IS GIVEN TO A PARENT'S WISHES FOR COMPANIONSHIP RIGHTS TO A NONPARENT, THE TRIAL COURT FAILED TO REVIEW THAT APPELLANTS HAD SUCCESSFULLY REBUTTED THE PRESUMPTION THAT [MOTHER] * * * ACTED IN THE CHILDREN'S BEST INTEREST, THEREFORE IT WAS IN THE CHILDREN'S BEST INTEREST THAT THEY HAVE COMPANIONSHIP TIME WITH THE APPELLANTS.

{¶ 38} Appellants argue the juvenile court's decision to terminate their companionship with Ar.B. and P.C.B. was not in the children's best interest. They contend that "[t]he potential harm of the children is a compelling interest that outweighs the 'special weight' given to [Mother's] wishes," and further argue that visitation is necessary so that they can "monitor to make sure the children are safe."

{¶ 39} It is well-established that a parent has a fundamental right to make decisions regarding the care, custody, and control of her children. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054 (2000); *In re N.C.W.*, 12th Dist. Butler No. CA2013-12-229, 2014-Ohio-3381, ¶ 18. By contrast, grandparents and other nonparent relatives have no constitutional right of association with the children. *In re Martin*, 68 Ohio St.3d 250, 252 (1994). Grandparents and other nonparent relatives, therefore, may only be granted visitation rights as provided by

statute. *See id.* at 252. "Given that a fit parent has a *fundamental* right to parent whereas the nonparent has only a statutory right to request visitation, the nonparent advocating visitation has the burden to prove that visitation will be in the child's best interest." (Emphasis sic.) *In re N.C.W.* at ¶ 25. "The standards of legal review 'are not different for reviewing a motion for termination of grandparents' [or nonparents'] visitation as they are for reviewing an original complaint for establishment of grandparents' [or nonparents'] visitation.'" *Id.* at ¶ 19, quoting *In re Kaiser*, 7th Dist. Columbiana No. 04 CO 9, 2004-Ohio-7208, ¶ 48. An appellate court, therefore, will not reverse a trial court's decision to terminate or continue visitation absent an abuse of discretion. *Id.* at ¶ 20, citing *In re S.K.G.*, 12th Dist. Clermont No. CA2008-11-105, 2009-Ohio-4673, ¶ 21. An abuse of discretion is more than an error of law or judgment; it requires a finding that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 40} R.C. 3109.12(A) provides, in relevant part, that "[i]f a child is born to an unmarried woman, the parents of the woman and any relative of the woman may file a complaint requesting the court of common pleas of the county in which the child resides to grant them reasonable companionship or visitation rights with the child." A trial court may grant companionship or visitation to the nonparent relative only if it determines that such visitation is in the best interest of the child. R.C. 3109.12(B). In determining whether to grant visitation rights to a nonparent relative, the trial court is required to consider all relevant factors, including the factors listed in R.C. 3109.051(D). *See In re N.C.W.*, 2014-Ohio-3381 at ¶ 20; *In re E.T.B.*, 12th Dist. Clermont No. CA2014-07-051, 2015-Ohio-2991, ¶ 29. These factors include the following:

> (1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, * * * the wishes and concerns of the child as to * * * companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation * * *;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

R.C. 3109.051(D).

{¶ 41} Of particular importance in this case is the factor that requires a trial court to consider "the wishes and concerns of the child's parents." R.C. 3109.051(D)(15). There is a presumption that "fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. *See also Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, ¶ 44. "Absent an allegation of parental unfitness, the parents' determination of their child's best interest must be afforded 'special weight.'" *In re E.T.B.*, 2015-Ohio-2991 at ¶ 30, citing *Troxel* at 69. *See also Harrold* at ¶ 12 ("Ohio courts are obligated to afford some special weight to the wishes of parents of minor children when considering petitions for nonparental visitation"). Therefore, "a fit parent's decision regarding visitation should be afforded great deference." *In re E.T.B.* at ¶ 30, citing *In re J.T.S.*, 12th Dist. Preble No. CA 2014-09-009, 2014-Ohio-364, ¶ 26.

{¶ 42} Under Ohio's nonparental visitation statutes, a trial court "afford[s] parental decisions the requisite special weight * * * [and] take[s] into * * * consideration the best interest of the child and balance[s] that interest against the parent's desires." *Harrold* at ¶ 43. In determining whether it is in the children's best interest to grant nonparental visitation, the parents' expressed wishes and concerns must be weighed against the other factors listed under R.C. 3109.051(D). *In re E.T.B.* at ¶ 31, citing *Celek v. Celek*, 1st Dist. Hamilton No. C-08117, 2009-Ohio-4990, ¶ 10.

{¶ 43} After reviewing the record, we find no error in the juvenile court's decision to

grant Mother's motions to terminate appellants' visitation with Ar.B. and P.C.B. The juvenile court evaluated the relevant statutory factors under R.C. 3109.051(D), acknowledged Mother's concerns and wishes about continuing visitation with appellants, and gave special weight to her wishes. Although there was evidence presented that Grandmother and Uncle are bonded with P.C.B. and Ar.B. and were actively involved in their lives, consideration of the best interest factors demonstrates it is not in the children's best interest for visitation to continue.

{¶ 44} Appellants' actions have exposed Ar.B. and P.C.B. to verbal arguments, physical altercations, and police involvement on a number of occasions. As the juvenile court noted, one particularly concerning event took place in January 2013, when appellants refused to allow Mother to leave Uncle's home with her children. The children were present when a fight ensued between the parties and the police arrived to handle the dispute. The children were also exposed to police involvement when appellants picked the children up from school on a nonvisitation day and when appellants refused to return the children to Mother on Easter weekend 2013.

{¶ 45} Appellants' actions not only exposed the children to police involvement, but their actions significantly interfered with Mother's parenting of the children and caused Mother grave concern. Appellants made statements to Ar.B. and P.C.B. that Mother is a "bad" parent and they do not need to listen to her. Grandmother also made inappropriate statements to the children about Mother's decisions to allow C.L., the children's biological father, and paternal grandmother around the children. The children were disturbed by Grandmother's threats to harm these individuals. Grandmother's threats to take the children and move to another state were also particularly worrisome to Mother.

{¶ 46} Although appellants expressed concern about the children's safety when the children are with Mother and C.L., there was no evidence presented establishing that Mother

was unfit to care for her children or to make decisions about whom to allow around her children. As the juvenile court noted, "there was no evidence provided * * * substantiating Mother's alleged drug abuse" and there was no merit found to the neglect and abuse allegations levied by Grandmother. Neither children services nor the police were ever able to substantiate claims of abuse when conducting well-being checks on the children.

{¶ 47} Further, with respect to Mother's decision to allow C.L. around the children, the juvenile court stated the following:

> Mother does not believe there is any harm for [C.L.] to be with the children. She testified she knows the victim in [C.L.'s] case and that the victim was a teenager and [C.L.] was barely an adult at the time of the offense. According to Mother, the sexual encounter between [C.L.] and the victim was consensual. The Court notes that the conviction is seven years old and there is no evidence that [C.L.] has committed another offense of similar import. *Mother is in the best position to determine whether her children should be around [C.L.].*
>
> * * *
>
> *The Court finds that the children are safe in Mother's care and her relationship with [C.L.] does not affect the health or safety of the children.*

(Emphasis added.)

{¶ 48} We agree with the juvenile court's finding that it is appropriate for Mother to determine whether C.L. should be allowed around her children. Based upon the evidence presented at the hearing, there is no indication C.L. poses a threat of harm to the children. Rather, from the testimony presented, it is apparent that P.C.B. and Ar.B. have benefited from their relationship with C.L. as he has taken on a father-like role in the children's lives. Appellants' fear of "potential harm" to the children is not a sufficient justification for appellants' interference in Mother's parenting of Ar.B. and P.C.B.

{¶ 49} Given the foregoing, we find that the juvenile court did not abuse its discretion in terminating appellants' companionship and visitation with the children. The record

demonstrates the juvenile court gave Mother's serious and legitimate concerns about continuing visitation with appellants the appropriate special weight in determining that continued companionship and visitation was not in the children's best interest.

{¶ 50} Appellants' first and second assignments of error are, therefore, overruled.

{¶ 51} Judgment affirmed.


PIPER, P.J., and S. POWELL, J., concur.